UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

SHAWN GALE ROSENBROOK,

                    Petitioner,                   Case Number: 02-10289-BC
                                                  Honorable David M. Lawson

v.

PAUL H. RENICO,

                    Respondent.

_____/

**OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

       The petitioner, Shawn Gale Rosenbrook, a state inmate presently incarcerated at the Richard A. Handlon Correctional Facility in Ionia, Michigan, has filed an application for the writ of habeas corpus pursuant to 28 U.S.C. § 2254 through counsel. The petitioner was convicted in 1998 of second-degree murder, Mich. Comp. Laws § 750.317, and conspiracy to commit larceny from a person, Mich. Comp. Laws §§ 750.157a, 750.357, in the Eaton County, Michigan circuit court. He was sentenced to a prison term of seventeen to fifty years for the murder conviction to run concurrently with a prison term of five to ten years for the larceny conviction. The petitioner challenges his convictions on the grounds that statements he made to police were improperly admitted in violation of the Fifth and Sixth Amendments and his right to due process; that the prosecution failed to disclose exculpatory materials in a timely manner; that an incompetent witness was allowed to testify and another witness allowed to mention that the witness passed a polygraph test; and that the evidence presented at trial was insufficient to support the intent element for the murder conviction. The respondent argues that the petitioner's claims are without merit. The Court agrees and will deny the petition.

I.

In 1997, the petitioner was charged with open murder, conspiracy to commit murder, and

possession of a firearm during the commission of a felony.  The charges arose from

the shooting death of Chuck Hadley, a marijuana dealer in the Charlotte area, at [the petitioner's] father's house in Bellevue on November 25, 1997, two days before Thanksgiving.  Originally, [the petitioner] then eighteen years old, and his friend Matthew Harton, seventeen years old, planned to "gank" Hadley (i.e., steal or rob him of his drugs or money), but they eventually decided to kill him to take over his drug territory.  Harton was a member of a gang in Charlotte called the Jungle People Vice Lords, which is affiliated with the Vice Lords and nationally affiliated with the "People Nation."  Tim Rodriguez, the self-styled leader of the gang, appointed Harton as the enforcer of gang discipline and encouraged him to recruit new members.  [The petitioner] was not a member of the gang, but Harton sought to recruit him with Rodriguez's approval.  Although [the petitioner] and Rodriguez never discussed the plan to kill Hadley, Rodriguez approved of Harton's and [the petitioner's] plan to kill Hadley.  Rodriguez provided the weapon, a .22 caliber handgun.

On the evening of the Tuesday before Thanksgiving 1997, [the petitioner] lured Hadley to his father's house under the pretext of "hooking" Hadley up with marijuana.  Meanwhile, Harton drove from Charlotte to Bellevue and waited for [the petitioner] to arrive with Hadley.  Harton then emerged from the darkness and shot Hadley to death.  After the shooting, Harton gave [the petitioner] the gun to hide, and then helped [the petitioner] move the body to a gravel pit area behind the house. [The petitioner] picked up the shell casings, and Harton washed the blood from the driveway.  [The petitioner] and Harton split the money that was taken from Hadley's wallet.  On the following evening, [the petitioner] and his friend, Michael Rahe, moved the body to some tall grass next to a pond on Mr. Handricks' farm, a neighbor of [the petitioner's] father.

On the following day, [the petitioner] told his father of his involvement in Hadley's shooting death.  [The petitioner's] father contacted Detective Benden of the Charlotte Police Department and informed him that [the petitioner] had been an eyewitness to Hadley's murder.  Later that day, Detectives Benden and Kellogg tape-recorded an interview with [the petitioner] in which [the petitioner] denied that he knew that Harton was going to shoot Hadley, claiming only that he and Harton had discussed "ganking" Hadley for his money or drugs.  As a result of [the petitioner's] interview, the police arrested Harton, Rodriguez and the other gang members.  On the following day, the detectives continued their investigation and re-interviewed [the petitioner] to focus on why Harton happened to be present at [the petitioner's] father's house.  After the second interview, [the petitioner] was arrested

-2-

and charged with open murder, conspiracy to commit open murder, and felony-firearm.

Subsequently, [the petitioner] was interviewed by Michigan State Police Sergeant John Palmatier for the purpose of a polygraph examination on December 4 and 11, 1997. In the first statement to Palmatier, [the petitioner] claimed that he and Harton planned only to "gank" Hadley, and that he was surprised when Harton shot him. However, in the second statement to Palmatier, [the petitioner] admitted that before the murder, he, Harton and Joshua Hansen, another member of the gang, had talked about killing Hadley to take over his drug territory. The prosecutor then charged [the petitioner] with first-degree premeditated murder, conspiracy to murder, and felony-firearm.

*People v. Rosenbrook*, No. 215007, 2001 WL 1456846, at *1-2 (Mich. Ct. App. Nov. 16, 2001).

On July 20, 1998, a jury in Eaton County, Michigan found the petitioner guilty of the lesser-included offenses of second-degree murder and conspiracy to commit larceny from a person. The jury acquitted the petitioner of the felony firearm charge. The trial court sentenced the petitioner to a term of seventeen to fifty years in prison for the murder and a concurrent term of five to ten years in prison for the conspiracy.

The petitioner raised his habeas claims in an appeal of right. The Michigan Court of Appeals affirmed the petitioner's convictions in an unpublished *per curiam* opinion. *People v. Rosenbrook*, No. 215007, 2001 WL 1456846 (Mich. Ct. App. Nov. 16, 2001). The petitioner raised the same claims in the Michigan Supreme Court. On July 29, 2002, the Michigan Supreme Court denied leave to appeal. *People v. Rosenbrook*, 467 Mich. 851, 649 N.W.2d 80 (2002).

The petitioner filed his habeas corpus petition through counsel on November 18, 2002. In it, he states the following grounds for relief:

I.   A series of highly incriminating statements allegedly given by petitioner Rosenbrook were admitted in derogation of Petitioner's right to due process of law and his rights under the Fifth and Sixth Amendments to the Federal Constitution.

-3-

    A.    Petitioner's statements were procured through deception and promises of leniency, rendering them involuntary and violating Petitioner's right to due process of law and his rights under the Fifth Amendment to the United States Constitution.

    B.    Statements 3 and 4, taken prior to and during polygraph examinations in this case, violated Petitioner's Fifth and Sixth Amendment rights and his right to due process of law and were thus inadmissible.

II.    Petitioner's due process right to a fair trial was violated when the state trial court denied his request for dismissal of charges or for a new trial after the prosecutor failed to timely disclose critical *Brady* material.

III.    Petitioner's due process right to a fair trial was violated when the prosecutor's star witness was allowed to testify despite incompetency and where a state police polygrapher testified that he believed that this witness was telling the truth.

    A.    Witness Matthew Harton, the shooter in this case, should never have testified due to his incompetency.

    B.    A state police polygrapher's testimony that he believed the shooter's testimony eliminated the possibility of a fair trial.

IV.    The writ must be granted where the evidence of intent to murder was constitutionally insufficient to support the conviction in this case, thus denying Petitioner his due process right under the Federal Constitution. (U.S. Const. Amends. V, VI, XIV) to a jury determination of guilt beyond a reasonable doubt based on sufficient evidence.

The respondent contends that the state court resolution of these issues was not contrary to or an unreasonable application of Supreme Court precedent.

II.

The provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub.

L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996), which govern this case, "circumscribe[d]" the

standard of review federal courts must apply when considering applications for a writ of habeas

corpus raising constitutional claims, including claims of ineffective assistance of counsel. *See*

*Wiggins v. Smith*, 539 U.S. 510, 520 (2003).

> As amended, 28 U.S.C. § 2254(d) imposes the following standard of review for habeas cases:
>
> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Therefore, federal courts are bound by a state court's adjudication of a

petitioner's claims unless the state court's decision was contrary to or involved an unreasonable

application of clearly established federal law. *Franklin v. Francis*, 144 F.3d 429, 433 (6th Cir.

1998). Mere error by the state court will not justify issuance of the writ; rather, the state court's

application of federal law "must have been objectively unreasonable." *Wiggins*, 539 U.S. at 520-21

(quoting *Williams v. Taylor*, 529 U.S. 362, 409 (2000); internal quotes omitted). Additionally, this

Court must presume the correctness of state court factual determinations. 28 U.S.C. § 2254(e)(1)

("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody

pursuant to the judgment of a State court, a determination of a factual issue made by a State court

shall be presumed to be correct."); *see also West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996) (stating

that "[t]he court gives complete deference to state court findings of historical fact unless they are

clearly erroneous").

The Supreme Court has explained the proper application of the "contrary to" clause as

follows:

> A state-court decision will certainly be contrary to [the Supreme Court's] clearly
> established precedent if the state court applies a rule that contradicts the governing
> law set forth in our cases. . . .
>
> A state-court decision will also be contrary to this Court's clearly established
> precedent if the state court confronts a set of facts that are materially
> indistinguishable from a decision of this Court and nevertheless arrives at a result
> different from [the Court's] precedent.

*Williams*, 529 U.S. at 405-06.

The Supreme Court has held that a federal court should analyze a claim for habeas corpus

relief under the "unreasonable application" clause of § 2254(d)(1) "when a state-court decision

unreasonably applies the law of this Court to the facts of a prisoner's case." *Id.* at 409.  The Court

defined "unreasonable application" as follows:

> [A] federal habeas court making the "unreasonable application" inquiry should ask
> whether the state court's application of clearly established federal law was
> objectively unreasonable. . . .
>
> [A]n *unreasonable* application of federal law is different from an *incorrect*
> application of federal law. . . . Under § 2254(d)(1)'s "unreasonable application"
> clause, then, a federal habeas court may not issue the writ simply because that court
> concludes in its independent judgment that the relevant state-court decision applied
> clearly established federal law erroneously or incorrectly.  Rather, that application
> must also be unreasonable.

*Id.* at 409, 410-11.  *See also King v. Bobby*, 433 F.3d 483, 489 (6th Cir. 2006); *Harbison v. Bell*, 408 F.3d 823, 828-29 (6th Cir. 2005); *McAdoo v. Elo*, 365 F.3d 487, 493 (6th Cir. 2004); *Rockwell v. Yukins*, 341 F.3d 507, 512 (6th Cir. 2003) (en banc).

### A.

The petitioner alleges first that his incriminating statements to the police were admitted in evidence in derogation of his right to due process and his Fifth and Sixth Amendment rights.  The petitioner made four main statements to the police that were later admitted into evidence at his trial. The petitioner first spoke to the Detective Benden on November 27, 1997, after his father called the police about the murder.  In the interview, which was tape-recorded and conducted in the presence of the petitioner's father, the petitioner claimed that he was taken by surprise when Harton appeared at his father's house and shot the victim.  The second statement, also tape recorded, was taken the next day in the presence of the petitioner's mother.  In this interview, Detective Benden called upon the petitioner to explain how Harton had known that the victim would be at the petitioner's father's house and the petitioner admitted that he and Harton had planned to rob the victim, but explained that he had no idea that Harton would kill the victim.  The petitioner was arrested for the murder immediately after the interview.  The third and fourth statements were taken in the course of polygraph examinations by Michigan State Police polygrapher John Palmatier in December of 1997, outside the presence of the petitioner's attorney.  In these statements, the petitioner first admitted to planning with Harton to rob the victim, then admitted to planning with Harton to kill the victim.

The trial court conducted a pretrial evidentiary hearing regarding the circumstances of the taking of the petitioner's statements.  *See generally People v. Walker*, 374 Mich. 331, 132 N.W.2d 159 (1965) (initiating a procedure for pretrial hearings, now known as "*Walker* hearings," to

determine whether a confession obtained during custodial interrogation may be deemed unconstitutional on the grounds that the confession was involuntary or the detainee was not advised of his rights under *Miranda*).  The trial court held that the statements were voluntary, and they were admitted as evidence in the trial.

1.

The petitioner alleges that his second statement to Detective Leonard Benden was involuntary because it was procured through deception and promises of leniency.  The petitioner says that he was led to believe that he was cooperating with the police and that he would testify for the prosecution in return for protection and the promise not to be charged with a crime.  The petitioner claims that he made certain admissions to the police because he believed the police required the admissions to secure his position.

At the *Walker* hearing, Detective Leonard Benden testified that when he interviewed the petitioner on November 27, 1997, two days after the murder, the petitioner did not admit any involvement in the crime, and he was not under arrest nor was he a suspect at the time.  Benden did not read the petitioner his *Miranda* rights before the first interview.  On the basis of this interview, the police arrested Matt Harton and Tim Rodriguez.  On November 28, 1997, Detective Benden conducted the second interview with the petitioner to determine how Matt Harton had known that Charles Hadley would be at the petitioner's father's home.  The petitioner admitted in his second statement to Benden that, prior to the murder, he had planned to rob Hadley with Matt Harton's help.

The petitioner and his mother testified that during the second interview, Detective Benden told the petitioner that Benden needed the petitioner to say that he had planned to rob Charles Hadley.  The petitioner testified that he agreed to say that there was a plan to rob the victim because

-8-

Benden told the petitioner that he would not be charged with a crime.  The petitioner further testified that he had thought he was helping Benden and that he would be permitted to go home after he answered Benden's questions.  Even after Benden announced that the petitioner was under arrest, the petitioner claims that he continued to believe that he was helping Benden.  He believed that the police arrested him to protect him from other people.  (Tr. 5/26/1998, at 75-86; Tr. 6/22/1998, at 127-36).

On cross-examination by the prosecutor, the petitioner admitted that he had prior experience with police officers on occasions when he was ticketed or arrested.  He also admitted that he had been familiar with his constitutional rights, that he was not ill, injured, intoxicated, or doing drugs at the time of his interview with Benden, and that he had not been threatened.  (Tr. 6/22/1998, at 147-58).

Detective Benden admitted at the hearing that he had told the petitioner the prosecutor would understand if the plan was just to rob Hadley.  However, Benden denied telling the petitioner that he was simply a witness or that he would not be arrested or charged in the case.  He did not think that he told the petitioner he could go home once he clarified the facts.  (Tr. 5/22/1998, at 44-49).

The trial court did not find credible the petitioner's testimony regarding Benden's alleged promise of leniency and solicitation of help.  The trial court noted that it made no sense for the petitioner to incriminate himself in a robbery that led to a murder in reliance on his belief that he would not be charged and arrested.  The court also found incredible the petitioner's belief that he was arrested for his own protection.  A tape-recording of Detective Benden's interview with the petitioner convinced the trial court that Bender did not lead the petitioner to change his statement involuntarily.  Benden did say during the tape-recorded interview that he knew the petitioner was

-9-

not part of the murder and that, if the petitioner had merely intended to "rob" Hadley, the prosecutor would understand. The trial court concluded, however, that this comment was not a promise of leniency and, if it was, it was only one factor to be considered in evaluating the voluntariness of the petitioner's statement.

The trial court considered a number of factors bearing on the voluntariness of the petitioner's statement, including the fact that the officer read the petitioner his constitutional rights; the petitioner was accompanied by an adult parent during the questioning; and the petitioner had prior involvement in the criminal justice system. The court also noted that there was no lengthy detention, repeated or prolonged questioning, injury, intoxication, poor health, physical abuse, threats, or deprivation of food, sleep, or medical care. The court found the petitioner's age, education and intelligence to be neutral factors. The trial court listened to the taped interviews between Benden and the petitioner and found that Benden's testimony that he made no promise that the petitioner would not be charged was more credible than the petitioner's testimony that he confessed to planning a robbery only because Benden told him he needed him to talk about a plan to rob the victim and he would not be charged. The trial court said that its review of the tape did not show that Benden prompted or led the petitioner to say anything. The court concluded that the petitioner's statement was voluntary. (Tr. 7/9/1998, at 8-12). The Michigan Court of Appeals held that the trial court did not err in finding that the petitioner's statement was voluntary.

To be admissible, a confession must be voluntary. A confession coerced by threats, violence, promises, or improper influence is not voluntary. *Bram v. United States*, 168 U.S. 532, 542-43 (1897); *see Lynumn v. Illinois*, 372 U.S. 528, 534 (1963). "An admission is deemed to be coerced when the conduct of law enforcement officials is such as to overbear the accused's will to resist."

-10-

*Ledbetter v. Edwards*, 35 F.3d 1062, 1067 (6th Cir. 1994) (citing *Beckwith v. United States*, 425 U.S. 341, 347-48 (1976)).  Courts must look to the totality of the circumstances when determining whether a confession has been elicited by unconstitutional means.  *Id*.

The Michigan Court of Appeals' decision that the statement was voluntary was not contrary to or an unreasonable application of Supreme Court precedent.  Although the petitioner was only a teenager when Detective Benden questioned him, he was familiar with the criminal justice system because he had experience with juvenile charges and had been read his *Miranda* rights on a few prior occasions.  The petitioner's testimony at the evidentiary hearing and at trial demonstrate that he was intelligent and articulate.  Benden's questioning of the petitioner was not lengthy, and, although the petitioner apparently had not slept much before the questioning, he testified that he had felt fine.

Whether Detective Benden unfairly induced the petitioner to make admissions by promising not to charge him with a crime is largely a credibility issue.  The trial court's factual finding that Benden's testimony was credible and that the petitioner's testimony was not credible is entitled to a presumption of correctness, rebuttable only by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).  The Court does not find clear evidence in the record that contradicts the state trial court's finding that the petitioner's statement was voluntary.  The Court cannot conclude, therefore, that the decision that was contrary to or an unreasonable application of Supreme Court precedent.

2.

The petitioner alleges that his two statements to Detective John Palmatier on December 4, 1997, and December 11, 1997, were inadmissible because they were taken in violation of his Fifth Amendment right to remain silent and his Sixth Amendment right to counsel during custodial

-11-

interrogation. The statements were taken before or during polygraph examinations, which the petitioner contends were a ruse to conduct custodial interrogations in his attorney's absence.

The Fifth Amendment provides that "[n]o person shall be . . . compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. To protect a suspect's Fifth Amendment right to remain silent, an individual who

> is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning . . . must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

*Miranda v. Arizona*, 384 U.S. 436, 478-79 (1966); *see also Dickerson v. United States*, 530 U.S. 428, 435 (2000). Furthermore, "absent a valid waiver, [a] defendant has the right to the presence of an attorney during any interrogation occurring after the first formal charging proceeding, the point at which the Sixth Amendment right to counsel initially attaches." *Moran v. Burbine*, 475 U.S. 412, 428 (1986). Once the right to counsel attaches, the police may not interfere with the ability of the defendant's attorney to mediate between the suspect and the state during interrogation. *Id.*

Detective John Palmatier testified at the *Walker* hearing that he recited the *Miranda* warnings to the petitioner before questioning him on December 4, 1997. The petitioner informed Palmatier that he understood his rights and was willing to waive them, answer questions, and forgo his right to have his attorney in the examination room. Palmatier said that he followed the same procedures on December 11, 1997, and that the petitioner was permitted to confer with his attorney and to call his mother during the interview. (Tr. 5/22/1998, at 69-90). The petitioner's former defense attorney testified that he knew in advance that the petitioner would waive his constitutional rights, and he did not object to being excluded from the examination room. (Tr. 6/29/1998, at 35, 40-42).

-12-

The trial court determined that the petitioner's statements to Palmatier were voluntary and not the result of police misconduct. (Tr. 7/9/1998, at 16). Because Palmatier reported the result of the first polygraph test to both the defense and the prosecution, which was that he believed the petitioner's answers to questions were somewhat deceptive, the trial court stated that it could not find that Palmatier deliberately misrepresented the results of the first polygraph test in order to secure a second opportunity to question the petitioner outside the presence of his attorney. The Michigan Court of Appeals reviewed the petitioner's constitutional claims on the merits and determined that the trial court did not err in admitting the petitioner's statements to Detective Palmatier. That court noted that both polygraph examinations were conducted at the behest of the petitioner's attorney and that the petitioner was advised of his rights each time.

The petitioner was not entitled to the exclusion of the statement on Fifth or Sixth Amendment grounds. In *Wyrick v. Fields*, 459 U.S. 42 (1982), the Supreme Court held that a petitioner's Fifth Amendment right to have counsel present during an interrogation was not violated where the petitioner made inculpatory statements after he was told he failed a polygraph test. The Court held that the petitioner in *Wyrick* initiated interrogation by requesting a polygraph examination, and that new *Miranda* warnings were not necessary merely because the polygraph examination had concluded. *Wyrick*, 459 U.S. at 47. Furthermore, "an accused who is admonished with the warnings prescribed by [the Supreme] Court in *Miranda*, 384 U.S. at 479, has been sufficiently apprised of the nature of his Sixth Amendment rights, and of the consequences of abandoning those rights, so that his waiver on this basis will be considered a knowing and intelligent one." *Patterson v. Illinois*, 487 U.S. 285, 296 (1988). The Seventh Circuit decided a case on similar facts in *Barrera v. Young*, 794 F.2d 1264, 1265 (7th Cir. 1986). In *Barrera*, the petitioner confessed

-13-

to a polygraph examiner during some preliminary questioning before the polygraph examination was to take place. At the time, the petitioner's attorney was waiting just outside the door of the room where the examination took place. *Id.* The Seventh Circuit found that the petitioner's statement was voluntary and that he validly waived his Sixth Amendment right to counsel. *Id.* at 1271.

The record indicates that the petitioner voluntarily waived his right to remain silent and his right to have his attorney present during both examinations by Palmatier. In fact, the petitioner's attorney took steps to arrange the examination with Palmatier and approved of the petitioner's waiver of his constitutional rights. Moreover, the petitioner was permitted to stop the questioning during the second examination to consult both his attorney and his mother. Therefore, the state appellate court's conclusion – that the petitioner's constitutional rights were not violated – did not result in a decision that was contrary to, or an unreasonable application of, Supreme Court precedent.

## B.

The second habeas claim alleges that the petitioner's right to a fair trial was violated by the prosecutor's failure to disclose evidence favorable to the defense. This claim arose near the end of the trial when defense counsel informed the trial court that he recently learned that the police had interviewed Terry Handricks and searched Handricks's property. Handricks apparently told the police that he did not speak with or see the petitioner on the evening when the petitioner allegedly left a body on Handricks's property. In addition, two police searches of Handricks's barn failed to turn up the bloody clothes that a witness said the petitioner left there.

The petitioner argues that he could have used this information to impeach Mike Rahe, who testified for the prosecution that the petitioner had asked him for help in moving Charles Hadley's

-14-

body from his father's property to a friend's property. Rahe further testified that they put the body in weeds next to a pond and that the petitioner took bloody clothes and other things out of the trunk of his car and put them in the man's barn. According to Rahe, the petitioner also entered the house, and, when he returned, he said that the man had instructed him to remove the body from his property. The petitioner then asked Rahe to help him move the body or sink it in the pond. (Tr. July 14, 1998, at 174-80).

Defense counsel apparently first became aware of Handricks's statements to police and the fruitless searches of his property during the trial, three days after Rahe had testified and been excused. The trial court denied defense counsel's motion for dismissal of the charges against he petitioner. Defense counsel then called Handricks to testify that he never saw or spoke to the petitioner on the day the body was moved to Handricks's property. Handricks testified that he came home that day just about when it became dark and he fell asleep early that night. When asked if anyone could have entered the house, Handricks acknowledged that someone could have entered while he was asleep, but that the person would have had to kick the door to open it. He also explained that he helped the police search outbuildings on his property and that the search failed to turn up any evidence.

The Michigan Court of Appeals found that the petitioner was not prejudiced by the tardy disclosure of this information because this evidence was eventually presented at trial. Moreover, the fact that the police did not find bloody clothes in the petitioner's barn does not directly contradict Rahe's testimony that the petitioner hid them there because the petitioner could have retrieved the evidence at a later time. The court also stated that Handricks's testimony was not inconsistent with

Rahe's testimony because the petitioner could have entered the house while Handricks slept and emerged to tell Rahe that they needed to move the body or sink it.

The Supreme Court held in *Brady v. Maryland*, 373 U.S. 83, 87 (1963), that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." A *Brady* violation will not entitle a habeas petitioner to relief unless three components are established: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). "[F]avorable evidence is material, and constitutional error results from its suppression by the government, 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Kyles v. Whitley*, 514 U.S. 419, 433 (1995) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)).

The disputed evidence in this case was favorable to the defense because the police did not find any incriminating evidence in Terry Handricks's barn, and Handricks's statement that he did not talk with the petitioner about removing the body from his property was useful to impeach the testimony of an important prosecution witness. However, *Brady* applies only to a complete failure to disclose, not tardy disclosure, unless the defendant has been prejudiced by the delay. *Norris v. Schotten*, 146 F.3d 314, 334 (6th Cir. 1998).

The petitioner did not confront Mike Rahe with Handricks's statement to the police because Rahe had already testified by the time the petitioner learned of Handricks's interview with the police and the search of Handricks's property. Nevertheless, the petitioner was able to produce Terry

-16-

Handricks as a defense witness after the evidence was disclosed, and he elicited testimony from Handricks that the police failed to find any bloody clothes on his property. Handricks also testified that he did not see the petitioner and Rahe bring a body onto his property. (Tr. 7/17/1998, at 118-25). Handricks's testimony called Rahe's evidence into question, and therefore amounted to impeachment by counter-proof. The jury also was permitted to give substantive weight to Handricks's testimony.

Furthermore, the disputed evidence concerned only the petitioner's alleged attempt to dispose of the body and items related to the murder. Evidence received at trial other than Mike Rahe's testimony suggested that the petitioner had hidden or destroyed evidence and enlisted Mike Rahe's help in moving the body. The body actually was found on Handricks's property.

The petitioner argues that this evidence was disclosed too late in the trial for it to be used effectively, citing *Leka v. Portunado*, 257 F.3d 89 (2d Cir. 2001), for support. In *Leka*, the name of an off-duty police officer who witnessed a shooting on a street was not disclosed to the defense until three business days before the petitioner's trial was to begin. In response to a claim by the officer that the defense investigator had employed deceit to obtain his phone number, the court granted the prosecution's request to prevent the defense from interviewing the officer until just before his testimony at trial; the prosecution then failed to call the officer as a witness and the defense did not learn his account of the shooting, which was favorable to the defense. *Leka*, 257 F.3d at 99. Noting that the limited information disclosed to the petitioner "could have led to specific exculpatory information only if the defense undertook further investigation," the Second Circuit found that the petitioner in *Leka* was prejudiced by the tardy disclosure because the defense was unable to learn the nature of the exculpatory testimony of the officer and adjust his trial strategy

-17-

accordingly.  *Leka*, 257 F.3d at 101.  *Leka* is dissimilar to the case before the Court because the exculpatory information that was untimely disclosed was the officer's identity as well as the existence of two other eyewitnesses.  In the present case, the exculpatory information untimely disclosed was evidence that could be used to impeach details in the testimony of a prosecution witness.  Because the defense sought to impeach Mike Rahe with contradictory proof presented at trial, the mid-trial disclosure of this information did not significantly affect defense trial strategy. Furthermore, unlike the *Leka* petitioner, the petitioner in the present case ultimately presented the disclosed material to the jury through witness testimony.

Because the petitioner ultimately was able to impeach Rahe's testimony with the late-disclosed information, there is no reasonable probability that the result of the proceeding would have been different had the evidence of Terry Handricks's interview with the police and the search of his property been disclosed sooner.  The state court's determination that the petitioner was not prejudiced by the tardy disclosure of exculpatory evidence was not contrary to or an unreasonable application of *Brady v. Maryland*.

## C.

The third habeas claim alleges that the petitioner's right to due process was violated when the trial court permitted the prosecutor's star witness, Matt Harton, to testify, and the police polygrapher testified that he believed Harton was telling the truth.

## 1.

The petitioner contends that Harton was not competent to testify because he was a sociopath who lacked the capacity and sense of obligation to testify truthfully.  At the pretrial evidentiary hearing, the petitioner produced a psychologist as an expert witness to testify that Harton appeared

-18-

to exhibit the characteristics of a person with Antisocial Personality Disorder. The expert testified that an antisocial person may not have a sense of obligation to tell the truth. The trial court denied a motion to hold a separate hearing to determine Harton's competency to testify and declined to order an independent psychological evaluation of Harton for that purpose. The state court of appeals found that "there was no overwhelming medical and psychiatric evidence that Harton was 'a sociopathic liar with no sense of obligation to testify truthfully,' nor was there any evidence indicative of a 'compelling reason' to warrant a psychological evaluation," and that Harton's testimony was corroborated by physical evidence, other testimony, and the petitioner's own admissions. *People v. Rosenbrook*, 2001 WL 1456846, at *4.

The petitioner has not pointed to any federal court decision that requires state trial courts, as a matter of federal constitutional law, to determine whether an adult prosecution witness is competent to testify. His claim is based on state law, but the trial court's alleged violation of the Michigan Rules of Evidence is not a basis for granting the writ of habeas corpus. *See Pulley v. Harris,* 465 U.S. 37, 41 (1984). It is well-established that "federal habeas corpus relief does not lie for errors of state law." *Estelle v. McGuire*, 502 U.S. 62, 67 (1991) (quoting *Louis v. Jeffers*, 497 U.S. 764, 780 (1990)). The Sixth Circuit Court of Appeals has explained:

> "[E]rrors in the application of state law, especially rulings regarding the admission or exclusion of evidence, are usually not to be questioned in a federal habeas corpus proceeding." *Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1988). Generally, state-court evidentiary rulings cannot rise to the level of due process violations unless they "offend[] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Montana v. Egelhoff*, 518 U.S. 37, 43 (1996) (quoting *Patterson v. New York*, 432 U.S. 197, 202 (1977)); *see also Spencer v. Texas*, 385 U.S. 554, 563-64 (1967).

*Seymour v. Walker,* 224 F.3d 542, 552 (6th Cir. 2000). "Errors by a state court in the admission of evidence are not cognizable in habeas corpus proceedings unless they so perniciously affect the

prosecution of a criminal case as to deny the defendant the fundamental right to a fair trial." *Kelly v. Withrow*, 25 F.3d 363, 370 (6th Cir. 1994) (quoted in *Biros v. Bagley*, 422 F.3d 379, 391 (6th Cir. 2005)).

In Michigan, witnesses are presumed to be competent. *See* Mich. R. Evid. 601 (stating that "[u]nless the court finds after questioning a person that the person does not have sufficient physical or mental capacity or sense of obligation to testify truthfully and understandably, every person is competent to be a witness except as otherwise provided in these rules"). "The determination of the competency of a witness is a matter within the discretion of the trial court." *People v. Breck*, 230 Mich. App. 450, 457, 584 N.W.2d 602, 606 (1998). Furthermore, "'competency' is a matter of status not ability," *United States v. Ramirez*, 871 F.2d 582, 584 (6th Cir. 1989), and the only two groups specifically rendered incompetent to testify under the Michigan Rules of Evidence are the presiding judge and jurors sitting on the case. *See* Mich. R. Evid. 605, 606.

The petitioner has not shown that the trial court's resolution of this issue deprived the petitioner of a fundamentally fair trial. Harton had not been diagnosed as a sociopathic liar and he did not appear to be incapable of telling the truth. Harton did admit that he had lied in the past and that he would tell the truth within his gang, but not outside the gang. (Tr. 7/13/1998, at 140, 147-48). However, as the state court noted, his testimony was corroborated by physical evidence, the testimony given by Joshua Hansen and Mike Rahe, and the petitioner's own admissions. Whether his testimony was credible was a matter for the jury to decide. *Ramirez*, 871 F.2d at 584.

Furthermore, the petitioner's expert, Barry Mintzes, testified at the pretrial evidentiary hearing that a person who is diagnosed with an antisocial personality disorder does have the capacity to tell the truth. In Mintzes' expert opinion, the person does not always lie, and his memory, power

-20-

of observation, and ability to communicate are not affected by the disorder.  (Tr. 6/29/1998, at 142).

Dr. Mintzes responded in the negative when asked hypothetically whether he could determine if

Harton possessed a sense of obligation to tell the truth under oath if he had diagnosed Matt Harton

with antisocial personality disorder.  The trial court concluded that a witness who is capable of

telling the truth is competent to testify, and the fact finder then decides the witness's credibility.  (Tr.

7/9/1998, at 6-7).  The petitioner is not entitled to relief on this issue because he has failed to show

that the state court's refusal to hold a hearing on Harton's competency to testify deprived him of a

fundamentally fair trial.

2.

The petitioner also alleges that he was deprived of due process and a fair trial when Sergeant

John Palmatier testified on cross-examination that he believed Harton told him the truth when he

questioned Harton about the crime.  The following exchange took place during the disputed cross-

examination:

Q  [by defense counsel]  All right.  In this particular case, did you suggest to Shawn
[the petitioner] what his answers could or should be as you were interrogating him?

A  [by Palmatier] No, sir.

Q  Did you not also have a copy of Mr. Harton's statement in hand as you were
interrogating this gentlem[a]n?

A  I had talked to Matthew Harton prior to my talking with Shawn the second time,
and I had that statement available, yes.

Q  Did you refer to that statement from time to time as you were interrogating this
gentlem[a]n here?

A  I would not read specifics, nor did I show it to Shawn.

Q  My question is, did you refer to that statement, saying Harton says this or Harton
says that, this is Harton's version?  Did you do some comparing with him on that?

-21-

A  I don't believe that it was like that, no.

Q  *Then how was it?*

A  Again, you're asking me to go back and replicate.  I had told Shawn that I had talked with Matthew Harton and that I believed I knew what was true, but I needed to hear that from him without me telling him.  And I had the statement there, so that – because I won't lie to him.

Q  No one suggested that you have.  *The question is how did you use the Matt Harton statement?*  You had it with you.

A  Just that I had it there, so that he understood that I wasn't bluffing.  That in fact I had talked with Matthew.  *I believed that Harton was telling the truth*, but I needed to hear that from him without me giving him details.

Q  Let's back up for a second.  *You knew Matt Harton was telling the truth.*

A  *I believed that Matthew Harton was telling the truth.*

Q  Had you investigated anything that Mr. Harton had done in this case?

A  I had certainly talked with the detectives about certain physical case facts.

Q  And did you go out to any of the scenes or interview any of the witnesses?

A  I didn't go out to the scenes, no.

Q  Did you interrogate any witnesses involved in the case?

A  I think after, not prior to talking to Shawn the second time.  I don't think so.

(Tr. IV, 7/14/1998, at 112-13) (emphasis added).  Defense counsel subsequently requested a mistrial,

arguing that Palmatier had improperly injected an unresponsive comment into the proceedings.  The

trial court denied the motion for a mistrial but gave a curative jury instruction.  (Tr. IV, 7/14/1998,

at 127-30).  The Michigan Court of Appeals concluded on review of this claim that defense counsel

invited the error by purposely eliciting Palmatier's testimony that he believed Harton was telling the

truth.  The court of appeals stated that the petitioner had waived the issue by inviting the error.

-22-

The exchange recited verbatim between defense counsel and Palmatier supports the state court of appeals' conclusion.  It plainly appears that counsel's cross-examination strategy was to demonstrate that Palmatier had reached a conclusion that the petitioner was guilty and then set about the task of constructing a case against him.  Defense counsel therefore apparently sought to demonstrate that Palmatier already had chosen sides and, instead of approaching the investigation in a neutral way, he committed to Harton's version of the events so that the petitioner never had a chance.  That Palmatier admitted to that investigational bias does not equate to impermissible vouching for a witness, *see People v. Buckey*, 424 Mich. 1, 17, 378 N.W.2d 432, 440 (1985), or bolstering the credibility of a witness before it is attacked, which is not allowed as a matter of state evidence law.  *See* Mich. R. Evid. 608(a).

Defense counsel's cross-examination plan was a matter of trial strategy.  This Court finds that no error resulted from the exchange, but also concludes that the state court's conclusion that error was invited by defense counsel is reasonable.  Defense counsel arguably invited the error by (1) pressing Palmatier to explain how he had used Matt Harton's statement when questioning the petitioner and (2) repeating  Palmatier's comment that he believed Harton's statement to him.  The petitioner had a right to a fair trial, not a perfect trial.  *Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986).

The trial court twice instructed the jury to disregard Sergeant Palmatier's comment about the truthfulness of Harton's statement to him.  The trial court explained to the jury that Palmatier's comment was unresponsive to defense counsel's questions (although this Court does not believe it was) and that evaluating the credibility of witnesses was the duty of the jurors, not the witness (which was a proper limiting instruction under the circumstances).  (Tr. IV, 7/14/1998, at 130-31,

-23-

139).  The curative instructions were clear, forceful, and given soon after Palmatier made his disputed remarks.  Under these circumstances, the trial court's denial of the petitioner's motion for a mistrial did not constitute a denial of fundamental fairness.  *Zuern v. Tate*, 336 F.3d 478, 485-86 (6th Cir. 2003).  Therefore, the petitioner was not deprived of due process, and the state appellate court's denial of relief was not contrary to, or an unreasonable application of, clearly established federal law.

D.

The petitioner's fourth and final claim is that the evidence of intent to commit murder was insufficient to sustain the petitioner's murder conviction.  The petitioner alleges that he did not know a murder would occur and that his intent was not to kill, but to take Charles Hadley's money by false pretenses or to arrange a marijuana purchase for Hadley.  The Michigan Court of Appeals concluded on review of this claim that the evidence presented at trial was sufficient to convict the petitioner of second-degree murder.

"[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."  *In re Winship,* 397 U.S. 358, 364 (1970).  The critical inquiry on review of the sufficiency of the evidence to support a criminal conviction is "whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 318 (1979).

> [T]his inquiry does not require a court to "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt."  Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

*Id.* at 318-19 (internal citation and footnote omitted). This "standard must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." *Id*. at 324 n.16. In Michigan,

> [t]he elements of second-degree murder are: (1) a death, (2) caused by an act of the defendant, (3) with malice, and (4) without justification or excuse. *People v. Bailey*, 451 Mich. 657, 669; 549 N.W.2d 325 (1996).

> Malice is defined as the intent to kill, the intent to cause great bodily harm, or the intent to do an act in wanton and wilful disregard of the likelihood that the natural tendency of such behavior is to cause death or great bodily harm. *People v. Aaron*, 409 Mich. 672, 728; 299 N.W.2d 304 (1980).

*People v. Goecke*, 457 Mich. 442, 463-64, 579 N.W.2d 868, 878 (1998).

It is undisputed that the petitioner did not shoot Charles Hadley. Rather, the state's theory was that the petitioner aided and abetted Matt Harton, who killed Hadley. To be guilty of a substantive offense, an aider and abettor must "himself possess the required intent or participate while knowing that the principal possessed the required intent." *People v. Vicuna*, 141 Mich. App. 486, 495-96, 367 N.W.2d 887, 891 (Mich. Ct. App. 1985), *disapproved on other grounds by People v. Dalessandro*, 165 Mich. App. 569, 419 N.W.2d 609 (Mich. Ct. App. 1988). "The aider and abettor's 'specific intent or his knowledge of the principal's specific intent may be inferred from circumstantial evidence.'" *Warren v. Smith*, 161 F.3d 358, 361 (6th Cir. 1998). Aiding and abetting encompasses "all forms of assistance rendered to the perpetrator of the crime and comprehends all words or deeds which may support, encourage or incite the commission of a crime." *Vicuna,* 141 Mich. App. at 495; 367 N.W.2d at 891.

Significant evidence presented at trial suggested that the petitioner participated in planning the murder and knew that Harton intended to kill the victim that day. Matt Harton testified that the petitioner informed him two days before Thanksgiving Day in 1997 that he intended to take Charles

-25-

Hadley to his father's house, and that they (the petitioner and Harton) were going to kill Hadley that night.  Harton claimed that the two men had agreed previously to kill Hadley and that part of the plan involved getting rid of the body.  (Tr. 7/13/1998, at 72-74, 99-108, 115, 144).  Josh Hansen, a friend of the petitioner and Harton, testified that he had heard Harton and the petitioner discuss taking over Hadley's drug territory by killing him.  The petitioner had talked about where he could dump the body.  (Tr. 7/14/1998, at 142-47).

The petitioner told Detective John Palmatier in his fourth statement to police that discussions about killing Charles Hadley had started a couple of months before the murder.  He claimed that he was initially hesitant, but on November 25, 1997, he and Matt Harton decided that they would do it that evening.  The plan involved having the petitioner take Hadley to his father's place where Harton would shoot him.  (*Id.*,  at 89-91).

The petitioner presented witnesses to cast doubt on this characterization of the crime.  Defense witness Jose Villanueva testified that Matt Harton was a liar and that he had a tendency to blame other people when he got in trouble.  (Tr. 7/15/1998, at 197-98, 207).  Lantrel Wilson testified that he had shared a jail cell with Matt Harton, who admitted to Wilson that he had shot Hadley and that the petitioner had nothing to do with the murder.  (*Id.* at 216-17).  The petitioner denied having a plan to rob or kill Charles Hadley.  He claimed that he was surprised when Matt Harton walked up to Hadley and shot him.  He also claimed that his admissions to the police were the result of being threatened with life imprisonment if he did not cooperate and being pressured to tell the police what they wanted or needed to know.  (Tr. 7/17/1998, at 175-76, 178, 181-82, 193).  Although the petitioner presented substantial testimony in his favor, the jury was free to disbelieve the petitioner's evidence, including the witnesses who testified that Harton was lying.

-26-

Viewing the evidence in the light most favorable to the prosecution, a rational jury could have concluded that the petitioner and Matt Harton planned to kill Charles Hadley, and that the petitioner aided and abetted Harton in killing Hadley by bringing Hadley to a pre-arranged location where Harton could shoot Hadley.

The state court of appeals so concluded.  Although the state court did not mention *Jackson* in its opinion, it applied a standard of review identical to that outlined in *Jackson*, citing *People v. Wolfe*, 440 Mich. 508, 514-15; 489 N.W.2d 478 (1992), *amended* 441 Mich. 201 (1992), which acknowledges *Jackson* as the standard applied regularly by the state courts of Michigan.  This Court cannot conclude that the state court unreasonably applied federal law on the basis of the number of pages or paragraphs the court devoted to its discussion of an issue.

The state appellate court's conclusion – that the evidence was sufficient to support the murder conviction – was objectively reasonable.  Therefore, the state court's resolution of this issue was not contrary to, or an unreasonable application of *Jackson*.

III.

The state court decisions in this case were not contrary to federal law, an unreasonable application of federal law, or an unreasonable determination of the facts.  The petitioner has not established that he is presently in custody in violation of the Constitution or laws of the United States.

Accordingly, it is **ORDERED** that the petition for a writ of habeas corpus is **DENIED**.

s/David M. Lawson                           
DAVID M. LAWSON
United States District Judge

Dated: August 3, 2006

-27-

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on August 3, 2006.

s/Tracy A. Jacobs
TRACY A. JACOBS